Marshall, C. J.
 

 The allegations of the answer upon which the parties went to trial were in substance that tobacco growers who were citizens and residents of Ohio aggregating at least three-fourths
 
 *365
 
 of the producers of Burley tobacco in Ohio had signed contracts which were substantially identical in terms, the purpose of which was to bind the signers, including the defendant, “to agree in a manner to keep the price of such tobacco raised in Ohio at a fixed and graduated figure in Ohio by which the price of said tobacco between themselves and others should be so as to preclude a free and unrestricted competition among themselves, purchasers and consumers in the sale and transportation of such tobacco in Ohio,” whereby the price of tobacco might be fixed, contrary to the provisions of General Code, Sections 6390 to 6402, inclusive, known as the Valentine Anti-Trust Act.
 

 The reply did not deny that agreements had been signed by growers aggregating three-fourths of the producers in Ohio, but, on the contrary, admitted that similar contracts had been signed by a large number of growers, some of whom are residents of Ohio and some residents of other states.
 

 Without attempting to accurately weigh the evidence, a careful examination of the record fairly discloses that three-fourths of the producers of tobacco in Kentucky, Ohio, Indiana, and Tennessee are members of the association. The allegation that the purpose of the association was that of fixing prices was denied. It is the contention of the association that it was formed for the purpose of stabilizing tobacco markets in the interest of both grower and the public. The president of the association was examined, and testified that the purpose was “to receive tobacco belonging to the
 
 *366
 
 members, to merchandise it, and sell it.” And, again, “to feed the demand with the supply in an orderly way.” And again: “We have tried to sell it intelligently any time we could sell it for a fair price to the man who owned it.”
 

 It was further shown that the production of Burley tobacco has increased year by year since the organization of the association, and this notwithstanding that it appears that the officers of the association were furnishing information from time to time to the growers that more tobacco was being produced than the market would absorb and that the growers were advised to plant less acreage in tobacco and to employ their lands in growing alfalfa and other soil-building and forage crops which were more needed. It was further shown that a publication known as “The Burley Tobacco Grower” was issued by the association, and information was disseminated to the growers through this publication of crop conditions and of a surplus of Burley tobacco on hand, and of the market needs, nearly all of which information was obtained by questionnaires sent out to the growers, and from reports of the Kentucky department of agriculture, and the United States Bureau of the Census. It appears that practically all of the information was of the same kind and character as is freely distributed through governmental bulletins. The publication of the association further encouraged the tobacco growers to cultivate for quality rather than quantity. There was nothing in the agreement, or in the by-laws of the association, which became a part of the agreement, all of which were intro
 
 *367
 
 duced in evidence, which required the members to limit the production of tobacco, and it also appears by the record that there were enough independent producers and enough members of the association who disregarded the advice of the officers of the association to increase the production of Burley tobacco from year to year. The record further shows that by reason of the increase in the production, without any corresponding increase in the consumption, the association was not able to market the product of its members within the year of the production of the tobacco, and that at the time of the trial there was still a large quantity of unsold tobacco in the association’s warehouses. The result of this stagnation was that the members were not able to realize upon their tobacco before the planting of the next crop and this was a serious financial handicap.
 

 It was a feature of the agreement that upon delivery of the tobacco by .the growers to the association, all tobacco was pooled and mingled and graded and classified according to type, grade, and quality, in an effort to standardize and grade the quality and method and manner of handling, curing, and shipping. It was also agreed that the association, if in its judgment necessary, might cure or process or manufacture all or any portion thereof, and when finally sold pay the net proceeds less charges, costs, and advances among the growers in proportion to their deliveries to each pool, payments for which should be made from time to time as sold. Provision was also made for borrowing money upon warehouse receipts, so that ad
 
 *368
 
 vanees might be made to the growers in such amounts as the credits would justify.
 

 There were many other features of the contract and of the by-laws of the association and of the testimony reflecting upon the character of the transaction, but the foregoing indicates in a general way the things which were sought to be done and the manner in which they were accomplished. The defendant claims that this contract, and the manner in which it was intended to carry it out on his part, is a violation of Section 6391, General Code, which reads as follows:
 

 “A trust is a combination of capital, skill or acts by two or more persons, firms, partnerships, corporations or associations of persons, for any or all of the following purposes:
 

 “1. To create or carry out restrictions in trade or commerce.
 

 “2.
 
 To limit or reduce the production or increase, or reduce the price of merchandise or a commodity.
 

 “3. To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or a commodity.
 

 “á.
 
 To fix at a standard or figure, whereby its price to the public or consumer is in any manner controlled or established, an article or commodity of merchandise, produce or commerce intended for sale, barter, use or consumption in this state.
 

 “5.
 
 To make, enter into, execute or carry out contracts, obligations or agreements of any kind or description, by which they bind or have bound themselves not to sell, dispose of or transport an
 
 *369
 
 article or commodity, or an article of trade, nse, merchandise, commerce or consumption below a common standard figure or fixed value, or by which they agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure, or by which they" shall in any manner establish or settle the price of an article, commodity or transportation between them or themselves and others, so as directly or indirectly to preclude a free, and unrestricted' competition among themselves, purchasers or consumers in the sale or transportation of such article or commodity, or by which they agree to pool, combine or directly or indirectly unite any interests which they have connected with the sale or transportation of such article or commodity, that its price might in any manner be affected. Such trust as is defined herein is unlawful, against public policy and void.”
 

 Section 6393, General Code, is pertinent to the inquiry:
 

 “A
 
 contract or agreement in violation of any provision of this chapter is void and not enforceable either in law or equity.”
 

 The Valentine Law was passed April 19, 1898, and is generally conceded to have been patterned' after the Sherman Anti-Trust Act of July 2, 1890 (U. S. Comp. St., Sections 8820-8823, 8827-8830). A comparison of the two enactments shows that the Ohio law is in much broader and stronger terms than the federal enactment.
 

 It has been argued that this is an interstate transaction, and therefore not governed by the
 
 *370
 
 Ohio statute. There is much force to this claim, and upon the authority of
 
 United States
 
 v.
 
 Patten,
 
 226 U. S., 525, 33 S. Ct., 141, 57 L. Ed., 333, 44 L. R. A., (N. S.), 325, and other cases, it is difficult to see how this case differs materially from some of the federal cases involving prosecutions under the federal law, but inasmuch as that subject seems to be involved in confusion and controversy we prefer to dispose of this controversy upon the theory that it is an intrastate transaction.
 

 A discussion of the federal act and some of the federal authorities cannot be avoided, because it has been seriously urged that when the Valentine law was enacted in Ohio the Ohio Legislature adopted the judicial construction already placed upon the federal act by the federal courts, and that the interpretation is treated as incorporated therein. The earliest case in the United States Supreme Court construing the federal act was
 
 United States
 
 v.
 
 Trans-Missouri Freight Assn.,
 
 166 U. S., 290, 17 S. Ct., 540, 41 L. Ed., 1007. That was a five to four decision in which the majority opinion, written by Judge Peck-ham, declared for a strict interpretation of the act and that any restraint upon interstate commerce would constitute a violation, and yet conceded that certain agreements which had been in long-continued use, permitting reasonable restraints upon the vendor of property who agrees as a part consideration for his sale not to enter into the same kind of business for a certain time, or within a certain territory, would continue to be enforceable, notwithstanding the provisions of
 
 *371
 
 the Sherman Act. The minority opinion, concurred in by four members, contended that the law only forbade any unreasonable restraint of trade or commerce. That case was decided March 22, 1897. On October 24, 1898, the case of
 
 United States
 
 v.
 
 Joint Traffic Ass’n.,
 
 171 U. S., 505, 19 S. Ct., 25, 43 L. Ed., 259, was decided, and the former case was reaffirmed in all particulars. In that case three judges dissented, and one did not participate. Notwithstanding these very clearcut declarations of the Supreme Court of the United States, and notwithstanding the fact that the law was never amended to modify the broad language of the act and to limit the forbidden transactions to those restraints which were of an unreasonable nature, and notwithstanding the fact that the law was employed from time to time for many years thereafter, and contracts were repeatedly held to be illegal and in violation thereof, without regard to the reasonableness thereof, this question has more recently been argued before the Supreme Court of the United States in a number of cases, and the declarations of the earlier cases, above cited, have been essentially modified. In
 
 Standard Oil Co.
 
 v.
 
 United States,
 
 221 U. S., 1, 31 S. Ct., 502, 55 L. Ed., 619, 34 L. R. A., (N. S.), 834, Ann. Cas., 1912D, 734, and
 
 United States
 
 v.
 
 American Tobacco Co.,
 
 221 U. S., 106, 31 S. Ct., 632, 55 L. Ed., 663, that court laid down the following doctrine:
 

 “Only undue restraints of interstate or foreign trade or commerce are prohibited by the provisions of the act of July 2, 1890, Sections 1, 2, declaring illegal every contract, combination in the form of
 
 *372
 
 trust or otherwise, or conspiracy in restraint of such trade or commerce, and making guilty of a misdemeanor every person who shall monopolize or attempt to monopolize, or combine or conspire with any other person or persons to monopolize, any part of such trade or commerce.
 

 “The standard of reason which had theretofore been applied at the common law and in the United States in dealing with subjects of the character embraced by the prohibitions of the act of July 2, 1890, Sections 1, 2, against combinations in restraint of interstate or foreign trade or commerce, or monopolization or attempts to monopolize any part” of such trade or commerce, “was intended to be the measure used for the purpose of determining whether, in a given case, a particular act had, or had not, brought about the wrong against which the statute provided.”
 

 ' Those cases were decided on May 15 and May 29, 1911, respectively.
 

 On March 1, 1920, the United States Supreme Court decided the case of
 
 United States
 
 v.
 
 U. S. Steel Corporation,
 
 251 U. S., 417, 40 S. Ct., 293, 64 L. Ed., 343, 8 A. L. R., 1121. In that case the court declared a still more liberal doctrine, in which six judges concurred, as follows:
 

 “A holding corporation which by its formation united under one control competing companies in the steel industry, but which did not achieve monopoly, and only attempted to fix prices through occasional appeals to and confederation with competitors, whatever there was of wrongful intent not having been executed, and whatever there was
 
 *373
 
 of evil effect having been discontinued before suit was brought, should not be dissolved nor be separated from some of its subsidiaries at the suit of the government, asserting violations of the Sherman Anti-Trust Act, especially where the court cannot see that the public interest will be served by yielding to the government’s demands, and does see in so yielding a risk of injury to the public interest, including a material disturbance of, and, perhaps, serious detriment to, the foreign trade.”
 

 It should be remarked, however, that the later cases do not expressly overrule the earlier cases.
 

 After the decisions of the
 
 Standard Oil
 
 and
 
 American Tobacco Company cases,
 
 and before the decision of the
 
 United States Steel Company case,
 
 we find a strong expression of governmental policy on the part of Congress in one of the provisions of the Clayton Act, which is a supplement to the Sherman Anti-Trust Act, (38 Stat. 730). In Section 6 of the Clayton Act (Section 8835f, U. S. Comp. Stats.; Section 7963, Barnes Fed. Code) we find:
 

 “The labor of a human being is not a commodity or article of commerce. Nothing contained in the anti-trust laws shall be construed to forbid the existence and operation of labor, agricultural, or horticultural organizations, instituted for the purpose of mutual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members, of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal com
 
 *374
 
 binations or conspiracies in restraint of trade, under the anti-trust laws.”
 

 The Clayton Act was passed in 1914.
 

 Inasmuch as the Sherman Act was an expression of legislative policy and the courts have nothing to do with legislative policies, but are charged solely with the duty of ascertaining the legislative intent, it would have seemed a more orderly process for Congress to have modified the Sherman Law, if in the light of later economic problems it did not seem expedient to enforce it according to a strict interpretation of its terms, rather than to have the court recognize a changed economic condition and make a more liberal interpretation of the strict language of the act. But, however that may be, we are compelled to recognize the condition as it exists, to wit, that the federal courts are now; construing the Sherman Act according to the rule of reason. If the United States Supreme Court felt justified in modifying its former decisions interpreting the Sherman Act, then it would seem that the Supreme Court of Ohio might properly at this late date place the same interpretation upon the state enactment which the federal courts have found expedient to place upon the federal enactment.
 

 It may be conceded that earlier decisions of the United States Supreme Court by a bare majority did not definitely establish a principle, and this more especially when at a later date, by reason of a change in the personnel of the court, those decisions have been seriously modified.
 

 Let us for a moment examine the first two cases
 
 *375
 
 of this court interpreting the Valentine Act. In
 
 State ex rel.
 
 v.
 
 Standard Oil Co.,
 
 61 Ohio St., 520, 56 N. E., 464, this court decided a suit to dissolve the Standard Oil Company, and, while the company was ordered dissolved, a careful reading of the opinion of Judge Shauck discloses that the court only decided that that particular combination was hurtful, and therefore unlawful. We quote the following from the opinion at page 548 (56 N. E., 467):
 

 “In all considerate discussions of the subject [the police power] it is conceded that in the exercise of this power the Legislature can prohibit only those uses of property which are hurtful to the public, and the inhibited use must be hurtful in a legal sense.”
 

 It is true that at the same page it was declared that
 
 United States
 
 v.
 
 Trans-Missouri Freight Ass’n.,
 
 166 U. S., 290, 17 S. Ct., 540, 41 L. Ed., 1007;
 
 United States
 
 v.
 
 Joint Traffic Ass’n., 171
 
 U. S., 505, 19 S. Ct., 25, 43 L. Ed., 259, and
 
 Addyston Pipe & Steel Co.
 
 v.
 
 United States,
 
 175 U. S., 211, 20 S. Ct., 96, 44 L. Ed., 136, were applicable to legislation of the character of the Valentine Act, because that act is not substantially different from the federal statute, and it was also stated that the facts of the case then under consideration were not substantially different from the facts of those federal cases.
 

 In
 
 State
 
 v.
 
 Gage,
 
 72 Ohio St., 210, at page 228, 73 N. E., 1078, 1079, Judge Shauck stated:
 

 “It is clearly shown that there are contractual rights with reference to the use of one’s property
 
 *376
 
 and faculties which the General Assembly is powerless to destroy; that a valid enactment to prohibit the making of contracts must be within the police power; and that to be within that power the prohibited contract must be hurtful to the public, and hurtful in a legal sense.”
 

 Again, at page 231 (73 N. E., 1080) of the opinion, we find the following: “Within the limits of the present case, it is obvious that the effect of the statute is to prohibit affirmatively such contracts and transactions as were previously unlawful, but which could be so adjudged only when the aid of the courts was invoked for their enforcement.”
 

 The Supreme Court of the United States, in two rather recent cases
 
 (Maple Flooring Manufacturers Ass’n.
 
 v.
 
 United States,
 
 268 U. S., 563, 45 S. Ct., 578, 592, 69 L. Ed., 1093, and
 
 Cement Manufacturers Protective Ass’n.
 
 v.
 
 United States,
 
 268 U. S., 588, 45 S. Ct., 586, 592, 69 L. Ed., 1104), has declared trade associations and combinations to be lawful when formed for the purpose of gathering and disseminating information as to cost of product, volume of production, and other similar and related matters, where there was no agreement among their members, or any concerted action reached or attempted to lessen production or arbitrarily raise prices. These cases, while not the unanimous pronouncements of all members of the court, show the modern trend toward co-operation.
 

 The pronouncements of the later decisions of the United States Supreme Court relating to the
 
 *377
 
 Sherman Act, as compared with the earlier decisions, and the foregoing quotations from former decisions of this court relating to the Valentine Act, clearly indicate that the transactions which were sought to be prohibited by both those enactments were those transactions which were unlawful at common law.
 

 If the Valentine Act should be construed literally and strictly, no partnership could be formed, no corporation could be organized, no vendor could agree to a reasonable limitation upon his future business, no broker could represent more than a single merchant or manufacturer in the same industry, and a score of other things which have been permitted and approved for the past two or three centuries would now be under the ban. Antitrust legislation can only be enacted under the police power of the state, in furtherance of the public welfare, and it has repeatedly been declared by the federal courts and the courts of the states of the Union that it is beyond the power of any Legislature to prohibit or penalize contracts which are not injurious. Any statute which deprives the citizen of the inalienable right to make such contracts is unconstitutional and void.
 
 Palmer & Crawford
 
 v.
 
 Tingle,
 
 55 Ohio St., 423, 45 N. E., 313.
 

 Other cases of the United States Supreme Court and courts of last resort of the states of the Union where anti-trust laws prevail might be cited in large numbers showing that the trend, if not the universal pronouncement, is toward liberality and greater tolerance of co-operation in commerce and industry. The administrative forces of the federal
 
 *378
 
 government are more kindly disposed toward combinations than ever before, and are even encouraging combinations whose tendencies do not appear to be detrimental to the public welfare. The established interpretation of modern anti-trust legislation is that such laws are declaratory of the common law, and are enacted to provide the machinery for preventing the abuses of combination and co-operation and for penalizing and punishing those transactions which by the settled principles of the common law are declared to be unlawful. The transactions which are forbidden include agreements to restrict production for the sole purpose of enhancing price, stifling competition, or creating a “corner,” fixing prices at a definite standard, or combining in a manner that has a necessary tendency to oppress competitors or the public. On the other hand, it is recognized that competition may be reasonable or unreasonable. It may promote sound and sane relations between supply and demand, or it may ruinously place producers at the mercy of consumers and middlemen. Combinations formed to prevent disastrous competition have never been condemned unless unlawful means were employed.
 

 The instant case was tried upon the issues raised by the eighth defense of the amended answer, which charges that the purpose of this co-operative association was to bind the signers, including the defendant, to agree in a manner to keep the price of tobacco at a fixed and graduated figure, so as to preclude a free and unrestricted competition among themselves, purchasers, and consumers. It was
 
 *379
 
 declared by tbe trial court that tbe defendant had failed to establish that defense. Testimony of witnesses has already been quoted in this opinion, and it has already been shown, in which we agree with the trial court, that the testimony does not show that any unfair methods were employed in the marketing of tobacco, or that the methods which were in fact employed were calculated to injuriously affect trade and commerce, or to increase the cost of the finished product to the consumer. There has been no effort to crush or op-^ press other producers of tobacco; nor does the ^ evidence tend to show any agreement to limit or
 
 J
 
 reduce production. It is true that the association carried on certain educational work, and freely advised its members as to marketing conditions and the supply and demand in the tobacco industry, and even advised the growers to grow less tobacco and employ their lands in raising alfalfa and other forage producing and soil-building crops. Such efforts on the part of the association differed in no wise from the efforts of the federal Department of Agriculture, but, on the contrary, coincide perfectly with the efforts of the federal Secretary of Agriculture in all agricultural lines. The bulletins issued by the federal department show wide fluctuations in the volume of agricultural products, and it is the purpose of the department to try to bring about a more even and uniform production of all such products. Nothing is so conducive to speculation as the fluctuation of production, and nothing is so well calculated to promote normal relations between the producer and
 
 *380
 
 the consumer as a regular supply of products in accordance with a normal demand-for same. Nothing is better calculated to shorten the distance between the producer and the consumer. There has been a consistent effort on the part of our federal government for the last 50 years to bring it about that the country may become as nearly self-sustaining as possible. A failure to accomplish this laudable purpose must lead to dependence upon a foreign food supply and to dissatisfaction and consternation among our agricultural producers. The American government and the American people are committed to the maintenance of a resourceful, independent agriculture, and it should be the effort of all the branches of our government to aid agriculture in maintaining its proper place in our economic structure, on equal terms with all other producing groups. Information upon the subject of agricultural production is necessary to the American farmer in helping him to plan his annual crops, and upon no sound theory can it be claimed that this information amounts to an unlawful restraint of trade. The Secretary of Agriculture in a recent public address declared that which everybody knows, to wit: “Fluctuations in prices are due to economic surpluses more than to any other single cause.” A surplus is always desirable, but it should be only a reasonable surplus, including a necessary carry-over from one season to the next. It should never be over-production beyond the domestic and world demand. The information which has been given in this case has only been of that character which might properly
 
 *381
 
 serve to guide intelligent programs of production. The following quotation from the last annual report of the Secretary of Agriculture is pertinent to this issue:
 

 “A comprehensive system of standards and grades for farm products should be set up. The Department of Agriculture has made considerable progress on this project. It has already secured establishment of standards and grades for a number of major crops. Its cotton standards are accepted in the world’s markets. Such action reduces hazard in marketing and diminishes the margin between the farmer and consumer. Warehouses and temporary storage facilities should be made adequate and stored farm products given a credit status on a par with other commodities. The act permitting federal licensing of warehouses illustrates what can be done. Cold storage and merchandise dependent thereon can be developed beyond present limits.”
 

 One of the grounds of complaint in this case is that this association has purchased warehouses, and stores therein the tobacco of its members, and the foregoing pronouncement of the Secretary of Agriculture is therefore not only quite significant, but also clearly supports the soundness of the policy of this association and approves the legality thereof.
 

 The only fact in this case tending to indicate an effort on the part of the association to establish a fixed standard of prices is the storage of the tobacco beyond the year of its production, as was apparently done for the first year after the organi
 
 *382
 
 zation of the association. Clearly it is an unsound I business policy, as well as an unsound economic j policy, and, if it was the purpose of the association '■ in storing the crop beyond the year of its production to force the manufacturers to pay an ab-j normal price for the same, that mistake has been demonstrated and the association has already been properly punished. There are too many independent producers to permit such a plan to be successfully carried out, and this fact has been demonstrated by the constantly increasing production of Burley tobacco from year to year since the organization of this association. The government reports clearly indicate that this co-operative effort is stimulating increased production, and the reason is not far to seek. The mere fact of stabilizing marketing conditions has inevitably caused a steadier market and an increased production.
 

 Anti-trust legislation is aimed to prevent monopoly. A monopoly in general means the concentration of business in the hands of a few, or a combination for the purpose of raising or controlling prices. Applying this definition to the instant case, it is apparent that the business of raising tobacco has not been concentrated into the hands of a few persons. More than 100,000 growers are in the pool, but one-fourth of all the growers are outside of the pool, and it is apparent that those who are outside are getting as good prices ;for their product as those who are within the pool, jit is apparent that the pool is not able to control prices. The census shows that there are more than 6,000,000 farmers in the United States, and it
 
 *383
 
 is manifestly impossible to “corner” any branch of agricultural production. The number of growers of Burley tobacco is not made to appear in this record, but it is indicated that there are only 4 manufacturers of any consequence. Whether or not there is a larger number than 4 is not material, because it is quite certain that the number of manufacturers of Burley tobacco is quite limited and the number of growers is quite large. The situation is summed up by Judge Mauck, who wrote the opinion of the Court of Appeals, in the following cogent statement:
 

 “In any event, the number of domestic purchasers of raw tobacco is limited, and as a matter of common knowledge we take it as beyond dispute that in foreign countries there are state monopolies of tobacco that have the effect to diminish the number of purchasers in foreign markets. Moreover, the quality of raw tobacco widely varies. In fact, there would seem to be a greater variation in the quality of this product than of any other known to us. A producer of a modest crop may find that his crop consists of literally dozens of grades. It requires expert knowledge to sort a crop, getting like qualities separated from tobacco of dissimilar qualities. The grower not only lacks the knowledge necessary to properly sort and grade his own product, but if he could do so he would have so many different grades in a modest crop that he could only advantageously dispose of his crop by securing such different purchasers for the different grades as should happen to be interested in a particular grade. These suggestions, based
 
 *384
 
 on common knowledge, warrant us in saying that there are the strongest of reasons why those engaged in growing tobacco should be permitted to pool their tobacco for sale through a common agency, and that such pooling, far from tending to destroy commerce, tends to promote it, and that such pooling is not only within the spirit of modern legislation, but without such legislation would until a more satisfactory method is established constitute a well-nigh indispensable step in the transportation and marketing of this product under such conditions as would afford the grower a fair opportunity to sell his product under fair and equal conditions.”
 

 I This controversy involves a legal problem, but the legal problem cannot be entirely divorced from the economic problem. It is not a question of ■ control, but of reasonable regulation. There is no ; purpose to monopolize, but rather a purpose to stabilize, the production and marketing of Burley tobacco. We therefore agree with the trial court that there is no evidence of price fixing or other unlawful manipulation of normal conditions of supply and demand.
 

 It is claimed by counsel for the association that the act of the Ohio Legislature of 1923 (110 Ohio Laws, 91) has an important bearing upon this controversy. In that act it is provided that a cooperative marketing association shall not be deemed a conspiracy or combination in restraint of trade, or an illegal monopoly. The Clayton Act, in Section 6 thereof, contains a similar provision, and the Supreme Court of the United States, in
 
 Duplex
 
 
 *385
 

 Printing Press Co.
 
 v.
 
 Deering,
 
 254 U. S., 443, 41 S. Ct., 172, 65 L. Ed., 349, 16 A. L. R., 196, held that that section should be construed as not forbidding such exempted organizations from
 
 lawfully
 
 carrying out their
 
 legitimate
 
 objects, or, in other words, that such organizations shall not be held
 
 per se
 
 to be illegal combinations or conspiracies in restraint of trade; but that the section should not be construed as exempting such an organization or its members from accountability where there is a departure from normal and legitimate objects, and where there is an actual combination or conspiracy in restraint of trade. It was further held that that section could not be construed as authorizing any activity otherwise unlawful, or enabling a normally lawful organization to become a cloak for unlawful transactions.
 

 That law was not passed until 1923, which was subsequent to the time this cause of action accrued, and although it was attempted to make the same apply to any association theretofore organized under similar laws of another state, upon compliance with the regulations applicable to foreign corporations, that provision could have no retroactive effect, and any attempt to give it retroactive effect would be futile. The rights were fixed as of the time the contract was made and any attempt to secure retrospective operation would meet with the inhibition of Section 28 of Article II of the Ohio Constitution. By the terms of the latter clause of that constitutional provision there could be no curative effect given to the law under the circumstances of this case.
 

 
 *386
 
 It is further contended that the act of 1921 (109 Ohio Laws, 50) also has a hearing upon the proposition, but the answer to that is that that law was also passed after the effective date of the contract in the instant case.
 

 We are further referred to the act of 1920 (108 Ohio Laws, pt. 2, 1246). There is much force to this contention, because that law was in effect at the time this contract was entered into, and, although the law was made applicable to associations incorporated under that particular law, we are of the opinion that upon principles of comity an association incorporated under the laws of another state, doing business in Ohio in such manner as to be within the provisions of that law, might well claim as full protection under the law as though such corporation was organized under the , law itself. This principle has been discussed in a recent case decided by this court entitled
 
 American Soap Co.
 
 v.
 
 Bogue, ante,
 
 149, 150 N. E., 743. That was a case where it was sought to hold the individuals composing a corporation of a sister state personally liable for the debts of such corporation while doing business in Ohio without compliance with the laws relating to foreign corporations doing business in this state, and the stockholders were held not to be liable, because the Ohio statutes do not forbid such corporations from doing business in this state, but only provide that no action may be maintained in this state upon a contract made by it in this state until such compliance is made. Foreign corporations may therefore do business in this state without such compliance, and con
 
 *387
 
 tracts in the course of such business are valid, though recourse may not be had to the courts until a certificate of compliance with Ohio laws has been procured. This is in line with the pronouncements of
 
 Newburg Petroleum Co.
 
 v.
 
 Weave,
 
 27 Ohio St., 343, wherein it is held:
 

 “It is not contrary to the laws of Ohio, nor against public policy, in the present condition of her laws, for a foreign corporation, lawfully organized in a sister state, to do business in Ohio.”
 

 The act of 1920 (108 Ohio Laws, pt. 2, 1246) makes provision for co-operative associations in the marketing of agricultural products and provides :
 

 “Such association may act as agent for its members or any of them and perform for them any services connected with the production, preservation, drying, canning, storing, handling, utilization, manufacturing, marketing, or sale of agricultural products produced by them,” etc. Section 3.
 

 Those acts being declared to be legal by the Ohio Legislature must necessarily constitute a valid exception to the Valentine Act. It is true that agricultural interests are placed in a special class, and it only remains in this connection to determine whether such classification is reasonable and therefore not a violation of Section 26, Article II, of the Ohio Constitution.
 

 In the case of
 
 Connolly
 
 v.
 
 Union Sewer Pipe Co.,
 
 184 U. S., 540, 22 S. Ct., 431, 46 L. Ed., 679, the court had under consideration an anti-trust statute of the state of Illinois (Laws 1893, p. 188) similar
 
 *388
 
 in many respects to the Valentine Act, hut containing the following exemption clause:
 

 “Section 9. The provisions of this act shall not apply to agricultural products or live stock while in the hands of the producer or raiser.”
 

 The case originated in the district court of Illinois, and in an error proceeding the Supreme Court declared that the entire act was unconstitutional because the exemption clause made agricultural producers a favored class within the inhibition of the Fourteenth Amendment. The
 
 Connolly case
 
 has been cited a score of times in later decisions of the United States Supreme Court without being overruled, and it is not strange that it should be so cited, because it went to such unusual lengths in declaring principles of discrimination that it became a potent authority in every subsequent case where legislative discrimination was condemned. Mr. Justice McKenna wrote a dissenting opinion, the logic of which is unanswerable. He pointed out a number of cases which had theretofore quite recently been decided by that court in which the court had sustained classifications depending upon differences in the amount of legacies; differences between corporations; differences between land dependent for its use on agriculture, and land dependent on other purposes, in regard to the power of a city to annex it; differences between fire insurance and other insurance ; differences between the work of a barber and other labor, as to its necessity; differences between hiring persons to labor within the state and without the state; and, last
 
 *389
 
 but not least, differences between sugar refiners based solely upon whether the sugar to be refined was produced or purchased by the refiner. He then pointed out more particularly the inconsistency between the current case and
 
 American Sugar Refining Co.
 
 v.
 
 Louisiana,
 
 179 U. S., 89, 21 S. Ct., 43, 45 L. Ed., 102. In the sugar refining case the alleged discrimination was between manufacturers of sugar and growers of sugar, while in the
 
 Connolly case
 
 th¿ distinction was between traders (not producers) and growers. There was the further distinction that in the one case a tax was imposed and in the other there was a regulation of conduct. He then pointed out that the distinction is one of form and not of substance and that there can be no valid distinction in principle. Many years later the Supreme Court considered other cases in which the principles of the
 
 Connolly case
 
 have apparently been reversed.
 

 In
 
 N. Y. Cent. R.
 
 v.
 
 White,
 
 243 U. S., 188, 37 S. Ct., 247, 61 L. Ed., 667, L. R. A., 1917D, 1, Ann. Cas., 1917D, 629, it was held that the exclusion of farm laborers and domestic servants from the compulsory compensation scheme of the New York "Workmen’s Compensation Act is not such an arbitrary classification as to contravene the equal protection of the laws clause of the fourteenth federal amendment. And it was so stated on the ground that “it reasonably may be considered that" the risks inherent in these occupations are exceptionally patent, simple, and familiar.”
 

 In
 
 Miller
 
 v.
 
 Wilson, Sheriff,
 
 236 U. S., 373, 35 S. Ct., 342, 59 L. Ed., 628, L. R. A., 1915F, 829,
 
 *390
 
 the court had under consideration the question of unreasonable discrimination. A statute of California forbade the employment of women for more than 8 hours per day in hotels, but contained an exemption clause whereby women might be employed more than 8 hours per day in harvesting, curing, canning, or drying any variety of perishable fruit or vegetable. The exemption clause further exempted women employed in boarding houses and lodging houses. The law was held not to violate the fourteenth federal amendment, and it was stated in the opinion:
 

 “The Legislature is not debarred from classifying according to general considerations and with regard to prevailing conditions; otherwise there could be no legislative power to classify, for it is always possible by analysis to discover inequalities as to some persons or things embraced within any specified class.”
 

 In
 
 International Harvester Co.
 
 v.
 
 Missouri,
 
 234 U. S., 199, 34 S, Ct., 859, 58 L. Ed., 1276, 52 L. R. A., (N. S.), 525, the court sustained the validity of a Missouri anti-trust law which condemned combinations of manufacturers and vendors of articles while permitting combinations among purchasers, and which excluded from its operation combinations of wage earners.
 

 Many other cases have been decided by the United States Supreme Court which sustain the validity of statutes which create classifications, and it is the underlying principle of all decisions which uphold statutes creating reasonable classifications that the principle of equality is fulfilled if
 
 *391
 
 equality is observed between the members of a class, and that it is violated if such equality is not observed..
 

 It is manifestly impossible to maintain an absolute universality of operation, and it is inevitable that due regard must be paid to different capabilities, conditions, and relations between men and physical forces. The courts have universally approved classifications, and the only difficulty has been to determine the limits thereof. These limits have never been defined and each case must in large measure be decided upon its own peculiar facts, circumstances, and conditions. Manifestly there must be a wide latitude of selection left to the Legislature, and it is only when that power of selection has been abused that the courts may interfere.
 

 In determining whether co-operative associations organized for the purpose of marketing agricultural products are such a favored class as to be within the inhibitions of the fourteenth amendment, we must look to the fact that persons engaged in agriculture are widely scattered and compose so numerous a class that it is a physical and economic impossibility to combine them all in any commercial enterprise, and we should further look to the fact that many of them are very small producers of such limited means that they must market their products immediately after harvesting, and are therefore at the mercy of purchasers, without any voice whatever in making prices or terms. It must be recognized on the other hand that merchants and manufacturers
 
 *392
 
 dealing in any single line of agricultural products are comparatively few and congregated in definite localities. While this is not true of all agricultural production, it is certainly true of the tobacco industry. Such different situations and conditions were evidently considered by the Legislatures of the different states and by Congress, whose duty and province it is to consider the economic problems involved. Such legislative acts should not be held to be invalid and unconstitutional, unless clearly violative of the constitutional inhibition.
 

 In the last analysis this controversy turns upon a question of public policy. The earlier anti-trust legislation is being modified and certain well-defined exemptions are being created. The earlier decisions of the courts construing those acts strictly are being modified and overturned by later decisions. Section 6 of the Clayton Act, hereinbefore referred to, is a clear indication of a different policy on the part of Congress, and the CapperVolstead Act of February 18, 1922 (Sections 8716%, 8716%a, U. S. Comp. St. Supp., 1925; Sections 8256a and 8256b, Barnes Fed. Code), still further confirms the congressional trend. Still other legislation is now pending before Congress, which has passed the lower house of Congress by an almost unanimous vote, which still further extends the principle of permitting co-operation in agricultural marketing. Co-operative marketing acts have been passed by more than three-fourths of the states of the Union. These enactments have been upheld by the courts of last resort of 15 states of the Union, and, up to this time, in not
 
 *393
 
 a single case have any of such state laws been declared invalid. A partial list of the cases which have been so decided is as follows:
 
 Northern Wisconsin Co-operative Tobacco Pool
 
 v.
 
 Bekkedal,
 
 182 Wis., 571, 197 N. W., 936;
 
 Potter
 
 v.
 
 Dark Tobacco Growers’ Co-operative Ass’n.,
 
 201 Ky., 441, 257 S. W., 33;
 
 Tobacco Growers’ Co-operative Ass’n.
 
 v.
 
 Jones,
 
 185 N. C., 265, 117 S. E., 174, 33 A. L. R., 231;
 
 Brown
 
 v.
 
 Staple Cotton Co-operative Ass’n.,
 
 132 Miss., 859, 96 So., 849;
 
 Texas Farm Bureau Cotton Ass’n.
 
 v.
 
 Stovall,
 
 113 Tex., 273, 253 S. W., 1101;
 
 Kansas Wheat Growers’ Ass’n.
 
 v.
 
 Schulte,
 
 113 Kan., 672, 216 P., 311;
 
 Oregon Growers’ Co-operative Ass’n.
 
 v.
 
 Lentz,
 
 107 Or., 561, 212 P., 811;
 
 Washington Cranberry Growers’ Ass’n.
 
 v.
 
 Moore,
 
 117 Wash., 430, 201 P., 773, 204 P., 811, 25 A. L. R., 1077;
 
 Anaheim Citrus Fruit Ass’n.
 
 v.
 
 Yeoman,
 
 51 Cal. App., 759, 197 P., 959;
 
 Ex parte Baldwin County Producers’ Corp.,
 
 203 Ala., 345, 83 So., 69;
 
 Castorland Milk & Cheese Co.
 
 v.
 
 Shantz
 
 (Sup.), 179 N. Y. S., 131;
 
 Tobacco Growers’ Cooperative Ass’n.
 
 v.
 
 Patterson,
 
 187 N.C., 252, 121 S. E., 631;
 
 Dark Tobacco Growers’ Co-op. Ass’n.
 
 v.
 
 Mason,
 
 150 Tenn., 228, 263 S. W., 60;
 
 Dark Tobacco Growers’ Co-op. Ass’n.
 
 v.
 
 Dunn,
 
 150 Tenn., 614, 266 S. W., 308;
 
 Phez Co.
 
 v.
 
 Salem Fruit Union,
 
 103 Or., 514, 201 P., 222, 205 P., 970, 25 A. L. R., 1090;
 
 Minnesota Wheat Growers’ Co-operative Marketing Ass’n.
 
 v.
 
 Huggins,
 
 162 Minn., 471, 203 N. W., 420;
 
 Poultry Producers of Southern Cal., Inc.,
 
 v.
 
 Barlow,
 
 189 Cal., 278, 208 P., 93;
 
 Hollingsworth
 
 v.
 
 Texas Hay Ass’n.
 
 (Tex. Civ. App.), 246 S. W., 1068;
 
 Nebraska Wheat
 
 
 *394
 

 Growers’ Ass’n.
 
 v.
 
 Norquest
 
 (Neb.), 204 N. W., 798;
 
 Rifle Potato Growers’ Co-op. Ass’n.
 
 v.
 
 Smith
 
 (Colo.), 240 P.; 937.
 

 The public policy thus declared by legislation and thus universally upheld by judicial pronouncement must be held to be sound and not in contravention of any constitutional limitations, and the contract in controversy in this case must be held to be a valid and enforceable contract. The judgments of the lower courts must therefore be affirmed.
 

 Judgments affirmed.
 

 Matthias, Day, Allen and Robinson, JJ., concur.
 

 Jones, J., concurs in the judgment.
 

 Kinkade, J., dissents.