Wheat Growers Ass'n v. Oden.

•

No. 27,540.

THE KANSAS WHEAT GROWERS ASSOCIATION, *Appellant*,
v. A. E. ODEN, *Appellee*.

(257 Pac. 975.)

SYLLABUS BY THE COURT.

AGRICULTURE—*Marketing Association—Breach of Marketing Agreement — Monopolies — Renunciation of Associate Membership —Waiver by Acceptance of Membership Privileges.* In an action by a coöperative marketing association against one of its members for damages, as provided in the marketing agreement, for failure of the member to deliver his wheat to the association, the record is examined, and it is *held:* (1) That the agreement is not void as having been made in violation of the antimonopoly statute; (2) that fraudulent representations which induced the execution of the agreement were waived by the member participating as a member in association meetings after he had discovered the fraud; and (3) that the agreement had not been breached by the association in (*a*) failing to provide a local elevator where members could deliver and ship their wheat, nor (*b*) in failing to classify wheat of a member "by quality, grade, variety or other commercial standards," as provided in the agreement.

Appeal from Rice district court; RAY H. BEALS, judge. Opinion filed July 9, 1927. Reversed.

*T. A. Noftzger, George W. Cox, W. J. Masemore, R. L. NeSmith,* all of Wichita, and *L. E. Quinlan,* of Lyons, for the appellant.

*J. Graham Campbell, Ray Campbell,* both of Wichita, *W. W. Stahl* and *Ben S. Jones,* both of Lyons, for the appellee.

The opinion of the court was delivered by

HARVEY, J.: In this action the Kansas Wheat Growers Association seeks to recover from one of its members damages for his failure to deliver his wheat to the association as provided in the contract. The case was tried to the court, who made findings of fact and conclusions of law and rendered judgment for defendant. Plaintiff has appealed.

As supporting the judgment of the court below it is argued that the contract is void in that it violates our antitrust laws. (R. S. 50-101 *et seq.*) In previous cases this court has held that the contract in question and the statute (R. S. 17-1601 *et seq.*) authorizing it are not invalid for the reason that they tend to create a monopoly.

Agriculture, 2 C. J. p. 998 n. 31 new. Coöperative Associations, 11 A. L. R. 1185; 25 A. L. R. 1113; 33 A. L. R. 247; 47 A.. L. R. 936. Monopolies, 41 C. J. pp. 167 n. 63 *et seq.*, 168 n. 76. Statutes 36 Cyc. p. 1073 n. 35.

(*Wheat Growers Association v. Schulte,* 113 Kan. 672, 216 Pac. 311; *Wheat Growers Association v. Floyd,* 116 Kan. 522, 227 Pac. 336; *Wheat Growers Ass'n v. Loehr,* 118 Kan. 248, 234 Pac. 962; *Wheat Growers Ass'n v. Charlet,* 118 Kan. 765, 236 Pac. 657; *Wheat Growers Ass'n v. Sedgwick County Comm'rs,* 119 Kan. 877, 241 Pac. 466; *Wheat Growers Ass'n v. Rowan,* 123 Kan. 169, 254 Pac. 326; *Wheat Growers Ass'n v. Massey,* 123 Kan. 183, 253 Pac. 1093.)

These decisions have been repeatedly cited and followed by courts of last resort in other states construing similar contracts and statutes. (*Louisiana Farm Bureau C. G. Coöp. Ass'n v. Clark,* 160 La. 294; *Nebraska Wheat Growers Ass'n v. Norquest,* 113 Neb. 731; *Clear Lake Coöp. L. S. S. Ass'n v. Weir,* 200 Ia. 1293; *Dark Tobacco Growers' Coöp. Ass'n v. Robertson,* 150 N. E. 106, 113 [Ind.]; *Burley Tobacco Growers' Coöp. Ass'n v. Rogers,* 150 N. E. 384, 388 [Ind.]; *List v. Coöperative Ass'n,* 114 Ohio St. 361.)

Some of our cases, and many from other states, are cited in 41 C. J. 167, where it is said:

"Coöperative marketing associations organized under such statutes have uniformly been held lawful combinations and not in restraint of trade and not monopolies in the sale of the products handled by them, and therefore not within the condemnation of state constitutional provisions or of state antitrust acts, aimed at combinations in restraint of trade and monopolies. And the fact that a coöperative marketing association is large and powerful, and may sometimes be guilty of coercion or suppression of competitors, arbitrary fixing and maintenance of prices, or other acts making combination illegal, does not render it an unlawful combination or trust."

We are satisfied with the conclusions heretofore reached on this question and deem them not open to further argument. The only respect in which the question here differs, if it does at all, from those previously determined is this: It was contended, and the trial court found, that at the time the contract was made plaintiff's solicitor stated in effect that when, and if, the plaintiff increased its membership so as to include growers of fifty-one per cent of the wheat grown in the United States its plan then was to fix prices or to raise prices to the growers, and that this was one of the purposes defendant had in view when he signed the contract. It is contended this rendered the contract void. This contention lacks merit for two reasons: First, plaintiff's solicitor could not vary the terms of the contract nor the purpose for which plaintiff was organized by a statement of that character (*Wheat Growers Ass'n v. Charlet,* 118 Kan. 765, 766, 236 Pac. 657). Second, the time when or conditions

under which such an effort would be made, as the parties talked it, was to be at some indefinite, perhaps never-to-be-realized future time or condition; it was not an agreement contemplating immediate action in restraint of trade, as in *State v. Smiley*, 65 Kan. 240, 69 Pac. 199. To this may be added a third, that the coöperative marketing act, the organization of plaintiff thereunder, the preparation and execution of contracts with members, and the conduct of its business, all have for their purpose or design to get better or more stable prices to the growers of wheat. It is a statute passed later than our antimonopoly statute. Both are the exercise of the same legislative power of our government, and if in this respect it conflicts with the earlier antimonopoly statute—a question which we deem it unnecessary here to decide—it may be regarded as superseding it to the extent and for the purpose of coöperative marketing associations of the character permitted by the statute. (*List v. Coöperative Assn.* 114 Ohio St. 361; *Nebraska Wheat Growers' Ass'n v. Smith*, 212 N. W. 39, 44 [Neb.].)

Defendant contended, and the court found, that he was induced to sign the marketing agreement and to become a member of plaintiff's association by reason, in part at least, of false and fraudulent representations of existing facts made to him by plaintiff's solicitor. Plaintiff complains of the finding of the court in this respect as not being supported by the evidence. This complaint is not well taken. There is evidence in the record to support this finding of the court, and that settles the fact on this appeal. The evidence disclosed, however, and the court found that, after having discovered the fraud in the representations which induced him to execute the contract with plaintiff, defendant on three different occasions, either in person or by proxy, as a member of the association participated in general meetings of the membership for the purpose of electing officers and perhaps the transaction of other business. In *Wheat Growers Ass'n v. Rowan* and *Wheat Growers Ass'n v. Massey*, supra, it was held that participation as a member in such meetings amounts to a waiver of the right of the member to rescind his contract on the ground of fraud known to him at the time of such participation, and estopped him, when he was thereafter sued on his contract, from contending that he was not a member of the association nor bound by the contract. Defendant attempts to distinguish the holding in these cases from the case before us, and states the question of waiver is one of intent. In the court below defendant offered evidence tending to show, and

the court found, that when participating in the general meetings of the association, after having discovered the fraud which induced him to become a member, defendant did so for the purpose of attempting to elect new officers and with the hope of effecting a change in the management, and that he did not thereby intend to waive the fraud which induced him to become a member or to estop himself from pleading such fraud in a later action. The difficulty with this position is that from the very nature of things defendant cannot occupy two diametrically opposed positions with reference to his membership at the same time. He might very well upon the discovery of the fraud have renounced his membership and rescinded his contract, but if he did so it would not be material to him who were elected officers, nor would the business methods of plaintiff in the future concern him. Or he could waive the fraud which had been practiced upon him, retain his membership notwithstanding such fraud, and as a member be entitled to participate in the meetings as a voter in the election of officers, and thereby endeavor to modify the business practices of the plaintiff association to conform more nearly to his ideas. Only "members present in person or represented by proxy" were entitled to vote at such meetings. (*Everts v. Wheat Growers Ass'n,* 119 Kan. 276, 237 Pac. 1030.) But it is not conceivable that he could take both positions, contend that he was a member for some purposes and deny his membership for others. We are constrained to hold that by participating as a member in meetings of the association after the discovery of fraud which would have authorized him to rescind his contract, he in legal effect waived such fraud so far as his membership in the association was concerned, and that he cannot now be heard to say that he is not a member of such association. And this conclusion cannot be affected by the fact, if it was a fact, that at the time he participated as a member in the membership meetings of the association he reserved or harbored in his mind some secret intention not to be bound by the contract because of fraud which induced him to execute it, of which he then was fully informed. As was well said in *Wheat Growers Ass'n v. Massey,* supra:

"If defendant considered he was fradulently induced to become a member he was privileged to renounce membership, and renunciation would relieve him from obligation to comply with the marketing agreement. It rested entirely with him what he would do. He could rescind and stay out, or he

could stay in. But he could not consider himself out at marketing time, and in when corporate business was to be transacted, or keep membership and withdraw from the marketing agreement. No subtlety or sophistry can reconcile these inconsistencies." (p. 186.)

Defendant contended that, even if he could not rescind or abrogate the contract from the beginning, he was relieved from further carrying out the contract on his part for the reason that plaintiff had breached the contract in two important respects: (*a*) In not furnishing a local elevator to receive the wheat grown by defendant and other members of the association in that vicinity, and (*b*) in not classifying and accounting to defendant and other members for wheat delivered according to its quality. As to the first of these the complaint is that plaintiff did not arrange for a local elevator to receive wheat from members. The provision of the contract between plaintiff and defendant relating to delivering wheat reads as follows:

"4. (*a*) All wheat shall be delivered at the earliest reasonable time after harvest to the order of the association, at the warehouse or elevator controlled by the association; or at the nearest public warehouse or elevator, if the association controls no elevator or warehouse in that district; or by shipment as directed to the association, and by delivery of the indorsed wheat tickets or warehouse receipts or bills of lading properly directed."

The contract contains no provision that plaintiff will arrange for or furnish a local elevator to handle the wheat, hence, the contract was not breached by plaintiff's failure or inability to do so. The contract places the duty on the members to get the wheat to the association. The receiving of the wheat at local elevators and shipping it to the association is frequently arranged for by an organization of the members of the association in a vicinity known as a local. Defendant was a president of the Saxman local. Shortly before harvest in 1923 the president and secretary of the Saxman local signed a contract with the Kansas-Oklahoma Milling Company, which company was operating an elevator at Saxman, to receive and ship the wheat of the members of the association in that vicinity. That company received the wheat in 1923, but because of financial difficulties it closed and received no wheat in 1924 and 1925. No arrangement was made with any other elevator to receive wheat of the members at that point, and no attempt was made by the president or secretary of the Saxman local to arrange with any

elevator at Saxman to receive and ship the wheat of members of the association in 1924 and 1925.

Turning now to the question as to whether plaintiff breached its contract with defendant in respect to classification of his wheat. The contract contains these provisions:

"4. (c) The association shall make rules and regulations and provide inspectors or graders to standardize and grade the quality and the method and manner of handling and shipping such wheat, and the grower agrees to observe and perform any such rules and regulations and to accept the grading established by the state and federal authorities and the association. The association shall pool or mingle the wheat of the grower with wheat of a like variety, quality or grade delivered by other growers. The association shall classify wheat by quality, grade, variety, or any other commercial standards; and this classification shall be conclusive.

"6. The association agrees to resell such wheat, together with wheat of like variety, quality, grade and classification, delivered by other growers under similar contracts, at the best prices obtainable by it under market conditions . . ."

Defendant's contention is that the *quality* of wheat depends largely upon its protein content; that plaintiff did not make a proper test of the wheat delivered in 1923 as to its protein content, and therefore violated the contract to classify his wheat "by quality, grade, variety, or any other commercial standards." Plaintiff did classify defendant's wheat as containing twelve per cent protein, and settled with him on that basis. Defendant made no showing that this was an inaccurate classification; that this wheat contained more or less protein than twelve per cent, or that he was in any way injured or damaged by the classification of his wheat made by plaintiff. Defendant's sole contention is that he doesn't know whether or not this was a proper classification; that plaintiff did not take a sample from each load of his wheat and have it properly tested for its protein content; that it is possible his wheat, if properly tested, would have shown a larger per cent of protein, in which event it should have been classified differently and he might have received more money for it. The argument is purely speculative; he might have received less. Defendant did not furnish plaintiff a sample from each of his loads of wheat for protein analysis. Plaintiff did classify his wheat as to quality, grade and variety, including its protein content. The contract provides "this classification shall be conclusive." It is conclusive in the absence of any showing of fraud, mistake, or injury to the grower.

From what has been said it necessarily follows that the points relied upon by defendant are not well taken, and that the rulings of the trial court sustaining them were erroneous. It is stipulated that in 1924 and 1925 defendant sold elsewhere 4003 bushels 30 pounds of wheat which, if his contract was in force, should have been delivered to plaintiff.

The judgment of the court below is reversed with directions to enter judgment for plaintiff in accordance with this stipulation. The amount of attorneys' fees for plaintiff should be determined by the trial court at the time judgment is rendered.