Local Dairymen's Co-operative Association, Inc.
vs.
Leo Potvin et al.

Eq. No. 588.

July 12, 1933.

CHURCHILL, J. Heard on bill, answer and proof.

The complainant seeks an injunction to prevent the respondent Potvin, who operates milk trucks, from delivering milk contrary to the instructions of the complainant. The other respondents named in the bill are employees of Potvin.

At the foundation of the case are the statute passed in 1928 authorizing the formation of co-operative associations and defining their powers (Chap. 1202, January session, Public Laws 1928), the articles of association of the complainant and certain contracts made between the association and its members, producers of milk which the respondent has been delivering to dealers in Providence and its vicinity.

The statute in question authorized the formation of co-operative associations by producers of agricultural products which included in its definition dairy products.

The purposes for which the associations might be formed were described as "for producing, handling, processing, preparing for market, warehousing, financing, * * * and marketing the agricultural products of its members or for engaging in any activity pertaining to any of the things enumerated, including the financing, purchasing or otherwise securing for its members of supplies, equipment, machinery or commodities of any character."

Sec. 5, in a further enumeration of the powers conferred, provides in subsection G, as follows: "To enter into contracts with its members * * * requiring them to sell or market all or a specified part of their products to or through the association."

In sub-section J the association was empowered "to act as agent or representative of any member or members in carrying out the objects of the association."

This Act, it may be noted, is one of 16 similar acts enforced in various states of the Union.

Acting under this legislative authority, the complainant association took out a charter and articles of association. The purposes of the association are set forth at large and among them we find the following:

"To protect the Providence Milk Shed and to enable its members to ensure the full market value of their dairy products;

"To encourage better and more economical methods of milk production and distribution;

"To bring about a better understanding between the producers of dairy products and the consumers thereof;

"To better all conditions affecting the producing and distribution of dairy products in the Rhode Island area."

Among the powers conferred by such articles are found:

"G. To enter into contracts with its members for periods not over ten years requiring them to sell or market all or a specified part of their products to or through the association."

"J. To act as the agent or representative of any member or members in carrying out the objects of the association."

The contracts in force with members of the association contain the following provisions:

"1. The producer hereby appoints the association as sales agent to sell all milk and other dairy products produced on land in which he may have an interest, * * * and he hereby agrees to deliver his milk and dairy products to such shipping stations, milk plants, creameries or other places as may be designated by the association."

"5. The association agrees to act as sales agent of the producer and, as such, to sell and dispose of all milk, cream and other dairy products of the producer and other producers who have signed contracts similar hereto, by such methods and means as it deems of the highest advantage possible, subject to the provisions of paragraph three hereof."

"10. All milk, cream and other

dairy products of the producer, as soon as the provisions of Section 11 below are fulfilled and the producer has been notified, shall be delivered by the producer in accordance with the terms of this agreement."

There are approximately 1300 dairy farmers residing in the States of Rhode Island and Connecticut who are members of the association and whose milk comes into the Providence market or to nearby cities and towns. Milk for which the association is not able to find a market is sent to a plant in Central Falls maintained and operated by the association and there separated and the resulting products sold by the association.

Just previous to the formation of the association, Potvin was trucking milk from Eastern Connecticut for dairymen located there into Providence and its vicinity.

Elmer A. Havens, the general manager of the association, testified that shortly after the association was organized to do business in the spring of 1932, he, in behalf of the association, and Potvin reached an agreement as to the trucking price and that he gave him the stations at which the members' milk was to be delivered. This is denied by Potvin but it is apparent from all the testimony in the case that at some time in the spring of 1932 Potvin was furnished with a list of the members belonging to the association and the destinations for milk as by instructions from the association.

On September 2, 1932, owing to complaints received of a diversion of milk, a circular letter was sent by the association to all truckers handling the dairy products of members of the association, and in the second paragraph of the circular the truckers were plainly told that the association was the exclusive sales agent of its members and truckers were notified that "trans-fers of its members' dairies will not be permitted without the previous approval of this association."

Potvin denied having received this notice, but on the weight of the evidence the Court finds that Potvin did receive a copy of the circular letter (Complt's Ex. 4) in the early part of September 1932. After that time it is clear on Potvin's own testimony that he diverted milk from the destinations made known to him by the association and contrary to the instructions and orders of the association given through Havens as general manager. One specific instance of diversion among others is his refusal to deliver milk of members of the association to the plant in Central Falls although directed so to do by Havens. It is not necessary to labor other instances of diversions but it may be pointed out that in the case of a dealer named Perrino, Potvin refused to obey the instructions of Havens, taking the ground that he would do so only when the producer gave instructions as to destination or change of dealer.

The Court finds that after September 2, 1932, and after the receipt of the circular letter by Potvin, he refused to deliver milk delivered to him by producers who were members of the association, and known by Potvin to be such members, in accordance with the orders and instructions of the complainant association, and having notice that the association was the exclusive sales agent of such producers. And the Court further finds that he diverted milk so delivered to him by such members, so known by him to be members of the association, to dealers to whom he had been ordered by the association not to deliver milk.

The evidence also establishes the point and warrants the finding that the respondent Potvin, unless restrained, will in the future continue the practice of diverting shipments of

milk of members of the association from the destinations established by orders and instructions of the association. That the damage to the association and its members will be irreparable if such a practice is continued is too clear for successful argument. A disruption of its market is the final result with all the attendant loss, little of which loss could be recovered in any action at law, either against a member authorizing such diversion or the respondent who actually caused such diversion.

It is said that the member contracts are in restraint of trade. Although the shipments are interstate shipments, the case does not fall within the provisions of the Sherman Act, so-called, for reasons that by virtue of the Clayton Act, so-called, (38 Stat. 730), associations such as the one at bar were taken out of the operation of the Act.

The validity of member contracts in respect either to State statutes or to any common law rule has been established against successful attack by a long line of cases.

In *Liberty Warehouse Co.* vs. *Burley Tobacco Growers' Co-operative Marketing Ass'n*, 276 U. S. 71, the Supreme Court of the United States said:

"The opinion generally accepted— and upon reasonable grounds, we think—is that the co-operative marketing statutes promote common interests. The provisions for protecting the fundamental contracts against interference by outsiders are essential to the plan. This Court has recognized as permissible some discrimination intended to encourage agriculture."

To the same effect:

*Warren* vs. *Alabama Farm Bureau Cotton Ass'n*, 213 Ala. 61;
*Rifle Potato Growers Co-operative Ass'n* vs. *Smith*, 78 Col. 171;
*Lee* vs. *Clearwater Growers Ass'n*, 93 Fla. 214;
*Burley Tobacco Growers Co-operative Ass'n* vs. *Rogers*, 150 N. E. 384 (Ind. 1926);
*Kansas Wheat Growers Ass'n* vs. *Oden*, 124 Kan. 179;
*Potter* vs. *Dark Tobacco Growers Co-operative Ass'n*, 201 Ky. 441;
*Manchester Dairy System, Inc.* vs. *Hayward*, 82 N. H. 193;
*Elephant Butte Alfalfa Ass'n* vs. *Ronault*, 33 N. M. 136;
*Barns* vs. *Dairymen's League Co-operative Ass'n*, 220 App. Div. (N. Y.) 624;
*Northern Wisconsin Co-operative Tobacco Pool* vs. *Bekkedal*, 182 Wis. 571.

It is next argued that whatever the contract between the parties, the respondent is not bound thereby, being a stranger, and cannot be enjoined from delivering milk as the members of the association direct. This question has been authoritatively settled against the contention of the respondent. Equity has jurisdiction to prevent the interference by a third party in the contractual relations between the members and the association.

*Hitchman Coal & Coke Co.* vs. *Mitchell*, 245 U. S. 229;
*Potato Growers Co-operative Ass'n* vs. *Bond*, 80 Col. 516;
*Wilson* vs. *Monte Vista Potato Growers Coop. Ass'n*, 82 Col. 428;
*Hollingsworth et al* vs. *Texas Hay Ass'n*, 246 S. W. 1068;
*Tobacco Growers Coop. Ass'n* vs. *Pollock et al.*, 187 N. E. 409;
*Northern Wis. Coop. Tobacco Pool* vs. *Bekkedal*, 182 Wis. 571;
*Plez Co.* vs. *Fruit Union*, 103 Ore. 514.

It is further argued on behalf of the respondent Potvin that the complainant is estopped by representations made by Havens or that it is barred from relief by an agreement alleged to have been entered into by Havens,

on behalf of the association, and Potvin when the association was being organized in the spring of 1932.

Potvin testified that at the time the association was being organized Havens called upon him and requested Potvin to "help him on the association" and that he was requested to go out into the field which was being organized with his own men to help organize the association and that he agreed that "the boys would go out with him on the field if he wouldn't interfere in any way at all in my business of trucking milk in the City of Providence", and that Havens "promised me in any it wouldn't interfere with my business, for they were not interested in trucking".

This is somewhat corroborated by the testimony of Beaudoen, an employee of Potvin.

Mr. Havens testified that he went to Potvin's place and told him that a milk producers' association was being formed and asked Potvin if he would furnish information as to whom he was hauling milk for. "He said he didn't want us to do anything that would hurt him with the dealers. We told him as things went along with the association there would be no trouble."

Havens was an intelligent, frank and candid witness and his testimony impressed the Court as being trustworthy. On this point the Court accepts his statement as to the fact of whether there was an agreement as testified to by Potvin. On the testimony of Mr. Havens it is manifest without further argument that there is nothing which bars the complainant from relief.

The complainant is entitled to the relief it prays for.

For complainant: Wayne H. Whitman.

For respondent: Curran, Hart, Gainer & Carr.