SUPERIOR DAIRY, INC., APPELLANT, *v.* THE STARK COUNTY MILK PRODUCERS' ASSN. ET AL., APPELLEES.

(No. 2397—Decided June 14, 1950.)

*Mr. Warren G. Smith,* for appellant.
*Messrs. Day, Cope, Ketterer, Raley & Wright,* for appellees.

PUTNAM, J. This is an appeal on questions of law from a judgment of the Common Pleas Court of Stark County sustaining a demurrer to plaintiff's amended petition in an action for a declaratory judgment.

The plaintiff is an incorporated middleman distributor of milk, and the defendants are a co-operative milk producers association, its officers and members.

The prayer of the amended petition is for a judgment declaring the acts of defendants, in refusing to supply plaintiff with milk, to be in violation of the Valentine Anti-trust Act of Ohio.

The amended petition of the plaintiff, the truth of

which and the legitimate inferences deducible therefrom are admitted by the demurrer, has these vital allegations which are substantially as follows:

That plaintiff is a corporation duly organized and existing under the laws of the state of Ohio; that as such it is a distributor of milk in Stark county; that it purchases its milk from the members of the Stark County Milk Producers' Association under a contract with such association; that the members of the association produce practically all the milk sold in Stark county; and that the defendant Martin R. Moomaw is the manager of the association and the other defendants are members thereof as well as representatives of the routes allocated by the association to supply milk to the plaintiff.

The plaintiff alleges further that in August 1947 it inaugurated a program whereby it proposed to give a discount of one and one-half cents per quart to its customers and public consumers who would purchase over 90 quarts of milk per month and a discount of two cents per quart to those who would purchase over 120 quarts per month; that the defendants, after first threatening to stop the sale and delivery of milk to the plaintiff if it did not cease using its discount plan, did in fact instruct their drivers not to deliver any milk to plaintiff on and after September 1, 1947; and that, pursuant to the instructions of the defendants, milk was withheld by the drivers of the association on September 1, 1947, and thereafter, until the plaintiff agreed that it would terminate its discount plan.

Plaintiff seeks a judgment declaring the rights, status and legal relations between the parties. The defendants each filed identical demurrers to the amended petition for the stated reason that it appears on the face thereof that such petition does not state facts constituting a cause of action.

This being an action for a declaratory judgment, the provisions of that act control, and in the final analysis the question dispositive of the case is whether, under the allegations in the petition, the trial court abused its discretion in refusing to entertain the cause and make a declaration of rights.

The Ohio Declaratory Judgments Act (Sections 12102-1 to 12102-16, General Code) is identical with the Uniform Declaratory Judgments Act and is cited as such (see Section 12102-16, General Code). No separate rules of procedure or pleading are provided, and the procedural and substantive law in civil cases apply except as modified by the fact that declaratory action can be asked in the place of or in addition to coercive action.

Section 12102-5, General Code, provides:

"The enumeration in sections 2, 3, and 4 [Sections 12102-2, 12102-3, and 12102-4, General Code] does not limit or restrict the exercise of the general powers conferred in section 1 [Section 12102-1, General Code] in any proceeding where declaratory relief is sought, in which judgment or decree will terminate the controversy or remove an uncertainty."

We believe that the converse of this proposition is true, viz., that where the declaration will neither terminate the controversy nor remove an uncertainty, Sections 12102-2, 12102-3, and 12102-4 are a limitation on Section 12102-1. We are not concerned here with Sections 12102-3 and 12102-4.

Section 12102-6, General Code, provides:

"The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceeding."

It may be observed that the language in Section

12102-5 is, "in which a judgment or decree *will termi-
nate the controversy or remove an uncertainty.*"
Whereas in Section 12102-6 the language is, "would
not terminate the uncertainty or controversy." (Em-
phasis added.)

Query: Why this change of phraseology? This
court can see no difference in the meaning of these
phrases and believes they ought to be uniform.

It is to be noted that Section 12102-6 does not pro-
hibit a court from making a declaration even if the un-
certainty or controversy would not be terminated. It
only gives the court discretion to refuse in that event.
Consequently, a court could make a declaration where
it would not terminate an uncertainty or controversy,
if it chose to entertain the petition, but in that case
Sections 12102-2, 12102-3, and 12102-4 would be a limi-
tation on Section 12102-1.

We are neither begging the question nor uttering
an ipse dixit when we hold that a declaration in this
case would not terminate the uncertainty or contro-
versy giving rise to the action. In the original petition
there was no allegation of a contract. Upon the sus-
taining of a demurrer thereto an amended petition
was filed in which it was simply alleged:

"That the plaintiff has purchased milk, since 1938,
from such members of the Stark County Milk Pro-
ducers' Association as have been designated from
time to time by said association to supply milk to the
plaintiff, under a contract with the defendant, The
Stark County Milk Producers' Association and such
designated members thereof; that the plaintiff now
purchases approximately 90 per cent of its milk under
said contract."

No terms or conditions of the contract are set forth
so as to show any legal obligation imposed upon any
one thereunder. It is not alleged whether the contract

is oral or written. Certainly it is not such an allegation as would state a cause of action in an ordinary civil proceeding. Furthermore, it was admitted in open court by counsel for the plaintiff that the only contract claimed in the petition is an implied contract to pay for milk when, if and as received, at the price demanded at the time by the defendants. It is conceded that the supply could be cut off by the defendants from the plaintiff at any time, at the whim of the defendants, and no legal liability would ensue.

Hence, the question naturally arises as to what uncertainty or controversy would be terminated by a declaration in this action. The controversy mentioned in Section 12102-6, General Code, means a controversy based upon legal rights and obligations. Two farmers could dispute vigorously at the cross roads as to whose corn was the best and certainly this would be a controversy (to put it mildly), but it would not be a controversy involving legal obligations such as the instant statute contemplates.

Would this contemplated declaration terminate an uncertainty, and, if so, what uncertainty? That the defendants will deliver milk to the plaintiff in the future under any contract or without a contract? Certainly not. It probably would only aggravate an uncertainty, and not terminate it.

In the case of *United States* v. *Colgate & Co.*, 250 U. S., 300, 63 L. Ed., 992, 39 S. Ct., 465, the second paragraph of the syllabus is as follows:

"2. Conduct of a manufacturer which, as intended, has the effect of procuring adherence on the part of its wholesale and retail customers to resale prices fixed by it, does not offend against the unlawful combination provisions of the Sherman Anti-Trust Act of July 2, 1890 (26 Stat. at L. 209, chap. 647, Comp. Stat., 1916, Section 8820), where there was no agreement

which obligated any dealer not to resell except at the fixed prices, his course in this respect being affected only by the fact that he might, by his action, incur the displeasure of the manufacturer, who could refuse to make further sales to him.''

Consequently, in any event, we are relegated to Section 12102-2, General Code, which, under the reasoning herein, is a limitation on Section 12102-1, and which, outside the question of discretion, must be construed. This section is as follows:

''Any person interested under a deed, will, written contract or other writings constituting a contract, or whose rights, status or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status or other legal relations thereunder.''

Certainly under the Ohio decisions, which are not necessary to be quoted in detail, no declaration of rights would be proper unless the applicant had a right under a contract to have his status declared. This being so, the question resolves itself into the proposition of whether the alleged contract herein comes within the purview of the term ''contract'' as used in Section 12102-1, General Code. We recognize that Borchard, in his Treatise on Declaratory Judgments, disapproves of the pronouncement in the case of *Transport Oil Co.* v. *Bush,* 114 Cal. App., 152, 161, 1 P. (2d), 1060, in which it is stated that an oral contract cannot be construed under the act. However, this same authority concedes that the construction of oral contracts under the act should be limited. We find no Ohio authorities on this proposition. It is our judgment that under the language of this section, the

construction should be limited to written contracts. However, this determination is not decisive of the problem at hand. The vague, uncertain, and undefined contract set forth in the petition does not lend itself to an inclusion in the cases in which Professor Borchard states that a construction of an oral contract is proper.

Consequently, we are constrained to hold that the refusal of the trial court to entertain a petition which required the construction of a contract as uncertain as the one herein set forth was not erroneous as being a violation of Section 12102-2, General Code.

In argument, the plaintiff urged this court to make such analysis of this case, on its merits, as would aid in solving the problem presented by a possible conflict between the Co-operative Agricultural Marketing Act of Ohio (Section 10186-1 *et seq.*, General Code) and the Valentine Anti-trust Law (Section 6390 *et seq.*, General Code). Briefs by both parties have been exhaustive upon the merits of this proposition.

The plaintiff, on page 12 of its brief, states:

"The plaintiff wishes to make it clear that it is highly in favor of the purpose of these laws in authorizing the agricultural interests to organize so as to set a fair price at which they will market their products; but the plaintiffs feel that the Stark County Milk Producers' Association, and other defendants, in the instant case have gone further than the law intended in seeking to control the price at which the distributors shall sell its milk to the public. It is this latter question which the plaintiff seeks to have settled in this case, so that both producers and distributors may know where the dividing line lies between them in the matter of setting prices."

The demurrer is founded upon the statutory ground that the petition does not state facts sufficient to con-

stitute a cause of action. In view of the pronounce-
ment of the Supreme Court in the case of *Winslow* v.
*Ohio Bus Line Co.*, 148 Ohio St., 101, 117, 73 N. E.
(2d), 504, it is at least a fair inference that this court
should pass upon the question as to whether the peti-
tion states a cause of action. In view of the record and
this pronouncement we shall proceed to do so.

The case of *List* v. *Burley Tobacco Growers' Co-
operative Assn.*, 114 Ohio St., 361, 151 N. E., 471, was
decided in 1926. At that time Chief Justice Marshall,
who wrote the opinion, and Judge Matthias, the only
present day member of the court participating therein
and concurring, of course, never heard of the Wagner
Act and probably knew nothing of John L. Lewis.
Yet at page 392 of that opinion the court states:

"In the last analysis this controversy turns upon
a question of public policy. The earlier anti-trust leg-
islation is being modified and certain well-defined ex-
emptions are being created. The earlier decisions of
the courts construing those acts strictly are being
modified and overturned by later decisions. Section
6 of the Clayton Act, hereinbefore referred to, is a
clear indication of a different policy on the part of
Congress, and the Capper-Volstead Act * * * still fur-
ther confirm the congressional trend. Still other leg-
islation is now pending before Congress, * * * which
still further extends the principle of permitting co-
operation in agriculture marketing * * *."

Section 6 of the Clayton Act (Title 15, Section 17, U.
S. Code; 38 Stats. at L. [pt. 1], 760) contains the fol-
lowing pronouncement:

"The labor of a human being is not a commodity
or article of commerce. Nothing contained in the
anti-trust laws shall be construed to forbid the exist-
ence and operation of labor, agricultural, or horticul-
tural organizations, instituted for the purpose of mu-

tual help, and not having capital stock or conducted for profit, or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof * * *.''

There is no place in this pronouncement for any distinction between labor organizations and agricultural organizations.

It is conceded that the Valentine Anti-trust Act of Ohio and the Co-operative Agricultural Marketing Act of Ohio were patterned after the Sherman Antitrust Act and the Clayton and Capper-Volstead Acts. It is also conceded that these acts followed a federal legislative policy.

From 1932 to the present time, we have watched that federal policy expand until now, under the Wagner Act even as modified by the Taft-Hartley Act, labor is organized by industry on a nation wide basis with such tight control over production that it is almost necessary for a plumber to call in a carpenter to sharpen his pencil. Wages are dictated to the extent that management is told that any wage increase demanded must be paid out of earnings which are derived from sales at present market prices and no increases of market prices are permitted. Sanction is given to union contracts which permit labor to work ''if ready, willing, and able,'' thus curtailing production and surpluses and thereby affecting prices. In Pittsburgh, at present, we are witnessing a strike of milk distributors (not producers), which is not only raising prices but also cutting off the entire supply of milk to that metropolis.

In agriculture we have seen parity prices; price supports; the killing of pigs; and the dumping of apples, potatoes, eggs, wheat, and other perishable agricultural products. We have seen single families paid a subsidy of a quarter of a million dollars or more in

one year for raising potatoes which the nation did not need and could not consume. We have milk marketing acts and fair trade acts, and now a man by the name of *Brannan* desires to inaugurate a policy which in the end will give this country back to the Indians.

Yes, our federal and state policies have changed considerably since 1926 and especially since 1932.

' Of course, as Chief Justice Marshall said, courts as such have nothing to do with legislative policy, but in the interpretation of laws they are bound to take cognizance thereof. It is immaterial whether we as judges like this legislative policy or not.

In conformity with the necessity hereinbefore expressed, we do, outside our opinion as to the discretionary prerogative of the trial court, express our holdings on the merits of the petition. In conformity with the views expressed in the *List case*, hereinbefore referred to, we are guided in this question by legislative policy.

We wish we could offer an ultimate solution, but, being guided by legislative policy we must await events. No man knows the limits to which present legislative policy will extend.

The alleged misconduct charged against the defendants is simply that, without any binding contract to deliver any milk to the plaintiff at any time for any price or under any conditions, but only an implied contract to pay for the milk furnished at the price demanded, defendants have informed plaintiff that they do not choose to deliver to plaintiff any milk if plaintiff cuts the retail price. Since they could at any time stop deliveries for any reason without incurring any legal obligation, it is obvious that these actions fall far short of the inhibitions judged by a 1926 standard, and certainly are remote by 1950 standards, of legislative policy. Any interpretation of these two

acts which permits a labor organization to roam over an eighty acre field while confining an agriculture organization to the barn lot is neither just, desirable, nor proper.

Consequently we hold that the alleged actions of the defendants are permissible under the Co-operative Agricultural Marketing Act of Ohio and are not prohibited by the Valentine Anti-trust Act.

For both of the above reasons, viz., (1) that the court did not abuse its discretion for refusing to make a declaration herein, and (2) that the petition did not state a cause of action for declaratory judgment, the judgment is affirmed.

*Judgment affirmed.*

MONTGOMERY, P. J., concurs.
McCLINTOCK, J., concurs in the judgment.