The State, ex rel. Brown, Attorney General, *v.* Zayre of Ohio, Inc., et al.

[Cite as State, ex rel. Brown, v. Zayre of Ohio (1974), 41 Ohio Misc. 117.]

(No. 74-928904—Decided August 2, 1974.)

Common Pleas Court of Cuyahoga County.

*Mr. William J. Brown,* attorney general, *Mr. C. Raymond Marvin, Mr. Douglas Ross* and *Mr. Richard M. Firestone,* for relator.
*Mr. Newton A. Lane,* for respondent Zayre of Ohio, Inc.
*Mr. Herbert S. Bialosky,* for Economy Sales Co., Inc.
*Mr. Stanley N. Queler,* for the landlord.

McMonagle, J. This matter comes before this court on the complaint, filed on May 10, 1974, by the Attorney General of the state of Ohio, seeking preliminary and permanent relief and civil forfeiture against the defendants' continued violation of the antitrust laws of the state of Ohio, R. C. Chapter 1331 (commonly known as the Valentine Act). This final judgment has been agreed upon among all the parties, after conferences, and has been adopted by the court.

## FINDINGS OF FACT

Defendants Earle W. Kazis and Benjamin H. Schore (hereinafter Landlord) own the commercial area known as the Mentor City Shopping Center (hereinafter Center), located in the 7800 block of Mentor Avenue, Mentor, Ohio. They lease space in the Center to approximately 13 retail merchandisers of various goods and services, and manage the Center, together with defendant Earle W. Kazis Associates, Inc., a New York corporation.

Defendant Zayre of Ohio, Inc., is an Ohio corporation. Defendant Midwest Zayre, Inc., is a Missouri corporation, licensed to do business in Ohio, which has succeeded to the interests of Zayre of Ohio, Inc., in the leased premises in question. These defendants (hereinafter Zayre) do business as Zayre Department Stores, engaging in the retail sale of a wide range of merchandise and commodities to the general public.

Defendant Economy Sales Co., Inc., does business as Esco Distributing Company (hereinafter Esco), a discount catalogue showroom engaging in the retail sale of a wide range of merchandise and commodities to the general public. Esco's lines of merchandise make it a potential competitior of Zayre for the sale of many products.

As the major tenant of the Center, Zayre obtained lease provisions restricting the landlord's right to control the tenant mix of the Center. These lease provisions enable Zayre to exclude from the Center potential price and product competitors, and to limit the ability of such potential competitors to compete with Zayre if admitted to the Center. Restraints on price competition in Zayre's lease include the prohibition of any ''store advertised as a so-called discount type operation''; any apparel store, unless a ''so-called higher priced store, as distinguished from a popular priced store'' or operated by '''a national or regional chain store organization''; and any drug store, unless it sells at ''conventional retail prices with conventional retail mark-ups as distinguished from discount prices with less than conventional mark-ups'' or is operated by ''a national or regional chain store organization.'' Other lease

provisions eliminate other possibilities for competition by totally excluding classes of retailers who might compete with Zayre (department stores, variety stores, appliance stores, toy stores, juvenile furniture stores, etc.).

The right of another tenant of the Center, The Great Atlantic and Pacific Tea Company, Inc. (hereinafter A&P), to sublease its storeroom was subject to the rights and exclusives of other tenants in the Center. A&P sought to sublease its storeroom in the Center. After unsuccessful attempts to find a food retailer to assume its lease obligations, A&P sought the landlord's approval of Esco as a sublessee. Upon meeting with Esco, Kazis gave his approval, subject to the restrictions of Zayre's lease. Zayre first rejected Esco as a potential tenant, thus preventing Esco from competing for sales in the Center. Zayre later conditioned its approval upon Esco's agreement to pay Zayre $8,000 per year for each year of its sublease. Without reaching formal agreement with Zayre, Esco signed a sublease agreement with A&P, subject to the consent of the lessor and Zayre. Esco began doing business at the Center in May 1974, with its continued tenancy contingent upon obtaining waiver of Zayre's restrictive lease provisions.

The court finds that the above-described covenants in the lease agreement between the landlord and Zayre are a combination to create and carry out restrictions in trade or commerce, to prevent, hinder and limit competition, and to affect the prices both Zayre and its potential competitors may charge. The use of these lease provisions to prevent for a period of time the entry of Esco, another discount store operation and potential competitor of Zayre, and then to condition entry upon the payment of $8,000 per year from one competitor to another, demonstrates the anticompetitive character of such a cobination. The necessary and probable effect of such restraints is to impede the ability of Esco, or any other potential competitor of Zayre effectively to compete on price and otherwise, and thereby deprive the consuming public of the benefits of free and open competition. The court also finds that these restrictions on competition, embodied in the lease agreement be-

tween the landlord and Zayre and in the proposed $8,000 agreement between Zayre and Esco, will continue unless restrained.

## CONCLUSIONS OF LAW

The court has jurisdiction over the parties and the subject matter of this action and the complaint states a cause of action. The Attorney General of Ohio has standing to seek an injunction against these defendants' acts, under R. C. Chapter 1331 of the Ohio Revised Code. See R. C. 1331.11.

R. C. 1331.01 (B) prohibits, in pertinent part:

"* * * a combination of capital, skill or acts by two or more persons for any of the following purposes:

"(1) To create or carry out restrictions in trade or commerce;

"(2) To * * * increase * * * the price of merchandise or a commodity;

"(3) To prevent competition in * * * sale, or purchase of merchandise, produce, or a commodity;

"* * *

"(5) To make, enter into, execute, or carry out contracts, obligations, or agreements of any kind * * * by which they agree to pool, combine, or directly or indirectly unite any interests which they have connected with the sale * * * of such article or commodity, that its price might in any manner be affected.

"A trust as defined in division (B) of this Section is unlawful and void."

R. C. 1331.04 reads:

"A violation of Sections 1331.01 to 1331.14, inclusive, of the Revised Code, is a conspiracy against trade. No person shall engage in such conspiracy or take part therein, or aid or advise in its commission, or, as principal, manager, director, agent, servant, or employer, or in any other capacity, knowingly carry out any of the stipulations, purposes, prices, or rates, or furnish any information to assist in carrying out such purposes, or orders thereunder, or in pursuance thereof, or in any manner violate said sections. * * *"

The lease agreement between the landlord and Zayre, granting Zayre the right to control the tenant mix of the Center, thereby enabling Zayre to exclude potential competitors from the Center, and the use of the lease to exclude, attempt to exclude, or place at a competitive disadvantage, any potential competitor of Zayre, constitute an unlawful and void trust proscribed by R. C. 1331.01(B) (1), and specifically by R. C. 1331.01 (B) (2), (B) (3) and (B) (5). The provisions of Zayre's lease guarantee it complete freedom from price competition in the sale of a wide range of merchandise in, and to some extent beyond, the Center. The lease defines and limits the price, price range or pricing policy of any prospective tenant who would otherwise compete with Zayre. Other lease provisions eliminate price competition by excluding prospective tenants with merchandise similar to that sold by Zayre. Such restraints on price competition fall within the broad range of conduct condemned by the Supreme Court of the United States as price-fixing in *United States* v. *Socony-Vacuum Oil Co.* (1940), 310 U. S. 150, 221, as follows:

"* * * Any combination which tampers with price structure is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces. The [Sherman] Act places all such schemes beyond the pale and protects that vital part of our economy against any degree of interference. * * *

"Nor is it important that the prices paid by the combination were not fixed in the sense that they were uniform and inflexible. Price-fixing * * * has no such limited meaning. * * * Prices are fixed * * * if the range in which purchases or sales will be made is agreed upon * * * or if by various formulae they are related to the market prices. * * *"

This Sherman Act definition of price-fixing was adopted for Valentine Act cases by Ohio courts as early as 1947. *State, ex rel. Cullitan,* v. *Greater Cleveland Livery Owners*

*Assn.*, 35 Ohio Op. 68, 74 N. E. 2d 104 (C. P. Cuyahoga County 1947). As recently as November, 1973, Judge McNamee's adoption of this definition in *Cullitan* was quoted with approval in the consent judgment entered by Judge Gorman in *State, ex rel. Brown,* v. *Andrew Palzes, Inc.* (Com. Pleas, Cuyahoga County 1973), 1973-2 Trade Cases, Para. 74,764, at 95,329.

By establishing the price range below which potential competitors of Zayre may not do business, and controlling the pricing policies of these competitors, the lease agreement restricts the ability of potential competitors to compete on price. Whether the price range established is a maximum one, as in *Palzes, supra,* or a minimum one, as here, such conduct restricts the ability of potential competitors to compete on price. Both such forms of price-fixing have been prohibited since they "* * * cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." *Kiefer-Stewart Co. V. Joseph E. Seagram & Sons* (1951), 340 U. S. 211, 213. The restrictive covenants here have thus denied to the public the benefits of unrestrained competition which the Valentine Act seeks to guarantee.

Beyond the broad prohibition against restrictions in trade or commerce included in R. C. 1331.01 (B) (1), the Ohio General Assembly viewed certain specific agreements and practices as having such an adverse effect on competition as to be without possible justification, and necessarily held to be illegal, when shown. Recognizing the pernicious effects of price-fixing, the General Assembly enumerated specific prohibitions directed at any tampering with free-market pricing. Thus, the agreements and conduct of defendants, which violate the terms of R. C. 1331.01 (B) (2), (B) (3), (B) (4) and (B) (5) are illegal *per se.*

The doctrine of *per se* illegality in Ohio has roots in the common law. As early as 1880, in *Central Ohio Salt Co.* v. *Guthrie*, 35 Ohio St. 666, 672, the Ohio Supreme Court refused to enforce a contract among salt manufacturers, stating:

"* * * It is no answer to say that competition in the

salt-trade was not in fact destroyed, or that the price of the commodity was not unreasonably advanced. *Courts will not stop to inquire as to the degree of injury inflicted* upon the public; it is enough to know that *the inevitable tendency of such contracts is injurious to the public.*" [Emphasis added.]

Ninety-three years later the consistent application of *per se* treatment under the Valentine Act to price-fixing agreements was restated in *Palzes, supra*, at 95,329:

"A *per se* violation of the antitrust laws is that activity which has been determined by the Legislature or the courts to have such a pernicious effect on free and unrestricted competition that, once the activity or conduct is shown, no evidence of its reasonableness or business excuse may be used to justify it, nor need evidence be introduced to demonstrate its unreasonableness, or the specific injury resulting to the public or the economy. Price-fixing is a *per se* violation under the antitrust statutes of this state, *State ex rel. Cullitan* v. *Greater Cleveland Livery Owners Ass'n.* 74 N. E. 2d 104 (C. P. Cuyahoga County 1947); see also *Rayess* v. *Lane Drug Co.*, 138 Ohio St. 401 (1941), as well as under the common law. *Central Ohio Salt Co.* v. *Guthrie*, 35 Ohio St. 666 (1880)."

The *Palzes* decree, at 95,330, went on to state:

"It has repeatedly been held that price-fixing is contrary to the policy of competition underlying the Valentine Act and the Sherman Act, after which the Valentine Act was patterned and to interpretations of which Ohio courts look for authority, *State, ex rel. Monnett,* v. *Buckeye Pipeline Co.*, 61 Ohio St. 520, 56 N. E. 464 (1899); *Freeman V. Miller,* 9 Ohio N. P. (n. s.) 26 (Super. Ct. Cincinnati 1909); *United States Tel. Co.* v. *Central Union Tel. Co.*, 202 F. 66 (6th Cir. 1913); *List* v. *Burley Tobacco Growers Cooperative Assn.*, 114 Ohio St. 361, 151 N. E. 471 (1926); *State, ex rel. Cullitan,* v. *Greater Cleveland Livery Owners Assn.*, 74 N. E. 2d 104 (C. P. Cuyahoga County 1947); *Superior Dairy, Inc.*, v. *The Stark*, 89 Ohio App. 26, 100 N. E. 2d 695 (1950), and that the illegality of price-fixing "does not depend on a showing of its unrea-

sonableness, since it is conclusively presumed to be unreasonable. *United States* v. *McKesson & Robbins, Inc.*, 351 U. S. 305, 309 (1956).

"It makes no difference whether the motives of the participants are good or evil; whether the price-fixing is accomplished by express contract or by more subtle means; whether the participants possess market control; whether the amount of interstate commerce affected is large or small; or whether the effect of the agreement is to raise or to decrease prices. *Id.* No Ohio court has upheld a price-fixing arrangement, *State, ex rel. Cullitan*, v. *Greater Cleveland Livery Owners Assn.*, *supra*, at 108, and small combinations, as well as large ones, are denounced by the Valentine Act. *Id.* at 107."

Thus Ohio courts have uniformly read the Valentine Act to prohibit price-fixing as unreasonable without more and *per se* illegal, as have federal courts in applying the Sherman Act.

That conduct such as that of defendants falls within the practices deemed by federal courts to be illegal *per se* is apparent. In *Plymouth Dealers' Assn.* v. *United States* (9th Cir. 1960). 279 F. 2d 128, the court prohibited as price-fixing an agreement whereby defendants fixed one boundary of the price range within which sales could be made, as does the lease agreement which fixed the lower boundary of the price range within which tenants of the Center may do business. See, also, *United States* v. *Socony-Vacuum Oil Co.*, *supra.* In *United States* v. *Container Corp. of America* (1969), 393 U. S. 33, the United States Supreme Court determined that the exchange of past pricing information provided the defendants with some knowledge of price levels at which products were being sold by their competitors, as do the lease provisions by which Zayre controls the pricing policy of other tenants in the Center. This knowledge could then be used by each competitor in setting its future prices. The court did not find that an agreement had been made to sell at any particular price or even not to sell below a particular price, a restriction imposed upon tenants of the Center. The court simply found that the effect of such a system was to keep prices within a fair-

ly narrow range. This practice, without more, was held to be price-fixing, unlawful *per se*:

"The limitation or reduction of price competition brings the case within the ban, for as we held in *United States* v. *Socony-Vacuum Oil Co., supra*, at 224, n. 59, interference with the setting of price by free market forces is unlawful *per se*." *Id.*, at 337.

The court concluded that "price is too critical, too sensitive a control to allow it to be used even in an informal manner to restrain competition." *Id.* at 338.

Thus by the terms of the Valentine Act and Ohio case law, as well as federal antitrust cases repeatedly looked to as precedent in challenges to anticompetitive conduct, any combination which tampers with free market pricing is illegal *per se*. Recognizing their pernicious effect, no justification for such agreements or actions can be considered, lest the unequivocal commitment of both the state and federal governments to the principles and protection of free and unrestrained competition becomes bogged down in economic investigation, market analysis and endless debate over the true motives of the defendants. See *United States* v. *Socony-Vacuum Oil Co., supra*, at 220-221. It is to avoid such an emasculation of the antitrust laws that the doctrine of *per se* illegality was adopted.

The court takes note of the fact that the state has offered no evidence of any intent by any defendant to injure competition or the consuming public; neither has the state offered evidence of any specific adverse effect or damage to competition or the consuming public. In fact, each defendant disclaims any such intent, defendant Zayre contending that its actions toward Esco were merely intended to insure the presence of a supermarket within the Center. However, specific intent is not a necessary element of a violation of the Valentine Act. *Needles* v. *Bishop & Babcock Co.* (C. P. Franklin Co. 1904), 14 Ohio Dec. 445. Thus the lease agreement, and the conduct of defendants in reliance thereon, constitute a combination and conspiracy against trade as defined and prohibited by R. C. 1331.01 and 1331.04, and such agreements are unlawful and void. R. C. 1331.06.

Therefore, the court makes the following orders to in-

sure against continued violation of the Valentine Act, and to insure to each defendant the ability to conduct its business without unlawful interference from another.

## ORDERS

Based upon the foregoing, it is hereby ordered, adjudged and decreed that:

1. The lease provisions, or any other arrangements between or among any of the defendants which embody unlawful agreements restraining trade or commerce by price-fixing or otherwise, or which have been or may be used to achieve or enforce said unlawful agreements in restraint of trade or commerce, are void and rendered unenforceable.

2. The provisions or terms of any lease, contract, agreement or understanding between or among the defendants which have been or may be used to achieve or enforce, or which in any manner embody, the unlawful agreements to create or carry out restrictions in trade or commerce, to wit, the following provisions of the lease agreement dated April 30, 1966, between Earle W. Kazis and Benjamin H. Schore as Landlord and Zayre of Ohio, Inc. as Tenant for the rental of space in the Mentor City Shopping Center: Paragraphs 2(B) and 2(H); and as said paragraphs may have been amended, are void and unenforceable and the defendants therefore expunge them. Except for these provisions, said lease remains in full force and effect.

3. The defendants Zayre of Ohio, Inc., Midwest Zayre, Inc., and Economy Sales Co., Inc., D. B. A. Esco Distributing Company, are each permanently enjoined from, in any manner, directly or indirectly, requiring of, or agreeing between themselves or between or among either of them and other tenants or potential tenants to require of any tenant or potential tenant of the Mentor City Shopping Center, any price, price range or pricing policy in the operation of its business.

4. The defendants Zayre of Ohio, Inc., Midwest Zayre, Inc., and Economy Sales Co., Inc., D. B. A. Esco Distributing Company, are each permanently enjoined from, in any manner, requiring of, or agreeing between themselves or

between or among either of them and other tenants or potential tenants to require of, any tenant or potential tenant of the Mentor City Shopping Center, adherence to any plan, practice, program or device used or to be used to, in any manner, divide, allocate or apportion sales in said Center, by means of price, product, customer or territory.

5. The defendants Zayre of Ohio, Inc., Midwest Zayre, Inc., and Economy Sales Co., Inc., D. B. A. Esco Distributing Company, are each permanently enjoined from, in any manner, conditioning, seeking to condition, or agreeing to condition upon payments to any of them the right of any tenant or potential tenant to lease or sublease space or commence or continue to do business in said Center.

6. The defendants Zayre of Ohio, Inc., and Midwest Zayre, Inc., and Economy Sales Co., Inc., D. B. A. Esco Distributing Company, are each permanently enjoined from seeking to obtain, entering into, adhering to, continuing, maintaining, renewing, enforcing, or claiming any rights under any contract, combination, conspiracy or agreement to, in any manner, fix, determine, or interfere with their or any other tenant's or potential tenant's price, price range or pricing policy.

7. The defendants Earle W. Kazis, Benjamin H. Schore and Earle W. Kazis Associates, Inc., are each permanently enjoined from seeking to obtain, entering into, adhering to, continuing, maintaining, renewing, enforcing, or claiming any rights under, any lease, contract, combination, conspiracy, agreement, understanding or concert of action, which in any manner, fixes, determines or unlawfully interferes with, the price, price range or pricing policy of any tenant or potential tenant of the Mentor City Shopping Center.

8. The defendants are each permanently enjoined from, in any manner, continuing, maintaining or renewing the combination or conspiracy hereinbefore enjoined and from engaging in any other combination, conspiracy, contract or agreement having a similar purpose or effect and from adopting or following any practice, plan, program or device having a similar purpose or effect.

9. The plaintiff shall be permitted reasonable access to

128

documents and business records of any defendant for the sole purpose of determining and securing compliance with any judgment entered herein.

10. The defendants Zayre of Ohio, Inc., and Midwest Zayre, Inc., bear the costs of this action, together with attorney's fees in the amount of one hundred seventy-five dollars ($175), said attorney's fees to be paid into the state treasury to the credit of the Attorney General Antitrust Fund, in accordance with R. C. 109.82.